17-2279, Ricoh Industries, Inc v. TLC Group, Inc. Okay, will the lawyers who can argue this case please approach the bench and introduce yourself to the court. Good morning. My name is Alan Sohn, representing TLC Group, Inc. Good morning, Judge. My name is Gary Blackman with Leventhal Grossing. We're representing Ricoh Industries, Inc. Okay, you're going to have 15 minutes. You want to reserve some time, Mr. Sohn, for rebuttal? Fifteen minutes total for argument. Total. I'll reserve five minutes for rebuttal. All right, let's proceed. Thank you. Let me start off with a question that may be something you want to talk about. How can we give you relief when the affidavit that you based everything on was stricken by the trial court? Well, Your Honor, I think we addressed that question in the reply brief. I thought that the striking of the entire affidavit was error. I thought that Well, how could it be error when it wasn't based on personal knowledge? Well, I have the affidavit here with me, Your Honor. First of all, they recited the Safeway-Ebijimi case, which says that if there are allegations that are if there are statements in the affidavit of which the affiant has personal knowledge, then those statements should not be stricken. Only that part of the affidavit where the affiant cannot be said to have personal knowledge should be stricken. So in this case, it's clear from the affidavit that Tony Kerr, who is the president and owner of TLC Group, Inc., had personal knowledge of definitely Paragraph 16 through Paragraph 38 of the affidavit, which is found at the record in Volume 3, pages 18, 1824. He didn't have personal knowledge about the invoices from Walmart, did he? He had personal knowledge because he was receiving information from Walmart in his office. He had personal knowledge from the fact that he was being paid commissions based upon those invoices. He had personal knowledge of the purchase orders. Those were all coming through his office, as well as through the office of Ricoh Industries, Inc. A lot of this has to do with repurchases, and he would have no knowledge of repurchases. Well, he had knowledge of the fact that all of the products that were being sold, Walmart had a limited space in its stores, even though they're very large stores. They had limited space, and they didn't have warehouse space. So he had personal knowledge that this is over the five years that he was representing TLC, I'm sorry, representing Ricoh to Walmart. He had personal knowledge that products would be sold off of the shelves, and they would be reordered. That was how the whole process went. And he was being paid based upon the fact that Walmart had committed to a great deal of a product, but that they couldn't have, they couldn't issue purchase orders for all of that product immediately because they weren't going to be able to put it in their stores. So they would tell their vendors, including Ricoh, we're going to order, let's say, for the sake of argument, 100,000 of these keychains with the Alabama logo on them, but we're going to give you purchase orders for 30,000 now, and then as those sell out, we'll give you 30,000, we'll send you purchase orders for 30,000 later. And Ricoh would then base their production, base their purchases on the fact that they were going to get 100,000 purchase orders, order for 100,000 products, and Ricoh would actually pay Tony Care for the 100,000, not the 30,000 that they issued the purchase orders, but they would pay TLC Group, of which Tony Care is the president, they would pay him based upon those future orders that would come in. They always came in, they sold the product off the shelf, then they would get a call or an email from the buyer at Walmart, I need another 30,000, that's how the process went. So he had personal knowledge of all of that. He was involved inextricably with that. Well, is it true that Walmart only paid for what they sold? Whatever they didn't sell, they gave back? Well, I don't think there's any record that they gave anything back, Your Honor. Their contract between Ricoh and Walmart said that we're not obligated to pay for anything that we don't issue a purchase order on. But that's not what the contract between TLC and Ricoh said. That contract said we will pay you for any product for which purchase orders are issued or which are sold, and they treated the commitments as sold, and they paid TLC based upon the commitments for the future orders, which always came through. Now, but you didn't show any evidence here of damages, okay? I'm sorry? You didn't show any evidence of damages. In other words, there's no formula that you came up with that would say if you do this to do that, you could determine the damages. There's no way that you could show damages here in the way that you're answering this motion for summary judgment. Justice Gordon, we presented the trial court with a CD, which had 5,425 pages listing all of the purchase orders that were issued from December 2007 through December 2012. We presented that, and we and Mr. and Mr. Care could test the first of all the purchase orders were listed. But where was the formula to show what the damages would be? The formula was simple, Your Honor. No, but, you know, I'm not saying that you can't come up with one now, but where was it then? The formula was stated in the contract. The contract said on every single product sold by TLC to Wal-Mart that TLC was entitled to 12 years' extradition. Where was it in your response to the motion for summary judgment? It was in the response. How? Where? It was stated in the agreement was attached as an exhibit in the response. The agreement was. So somebody would have to figure that all out. Well, it wasn't, as I said, it wasn't difficult to figure out. That happened, Mr. Care could just testify to the 5,425 pages to all of the product items which are identified. I'm saying that you didn't put it anywhere in a formula that somebody could say this is $100,000 damages, this is $1 million damages, this is $2 of damages. You don't have that anywhere. I do have it in the response to the motion for summary judgment. I do have it in the exhibits. I do have it in the affidavit of Tony Care. The 12 percent. No amount is there and no formula is there. Well, the 12 percent commission, you take $27 million. No, I'm not saying you can't figure it out yourself, but there's nothing that the court could figure out. Well, that's the way. What you gave the court. The court, this court, the First District Appellate Court in Kay versus Prohlitz stated that Mr. Kay could testify based upon his knowledge of the sales and some summary reports. He could testify that he was entitled to X percent commission based upon the total sales. So this is what we told Judge Prohlitz. You know, I'm not saying no. I'm saying there's nowhere in the response to the motion for summary judgment that sets that out. I think there is, Your Honor. It's in the response to the motion for summary judgment that he's entitled to 12 percent commission on all sales. And it's in the motion for summary judgment that we have the W-2s and the 1099s that show the amount that was paid. So all you have to do is total the amount of the sales, multiply that by 12 percent, and deduct the amount that he was actually paid. We showed that he was shorted a couple million dollars in commissions over the years. We showed that it was a regular pattern, regular habit, not a habit, but a regular procedure of RICO to pay him less than the full amount of commissions to which he was entitled to. We showed that in e-mails. We showed that in check stubs. We showed that in every way. So would you agree that if we find that the affidavit was properly stricken that there is nothing before us? No, I wouldn't agree with that, Your Honor. I have a simple procedural question. We'll take the hard questions.  And then 1, 2, 3, 5, 7, and 8 were 615 dismissals. Is that correct? It was 4 and 6 that were summary judgments. Okay. Count 3 was on a 2615 motion to dismiss. So on the 615s, were those all with or without prejudice? Those were with prejudice. With prejudice. Right. So you were precluded from re-pleading. Right. Okay. That was my only question. Go right ahead. All right. You want to save some time for rebuttal? If I've used up my time, then I'll conclude. I think that it's in the ‑‑ I believe that it is in the response to the motion for summary judgment. It is in the documents that were presented to Judge Brennan in the trial court. We have the CD which shows all of the sales and the contract which shows that he was entitled to 12%. We have the W-2s and 1099s which shows that he was paid. All that was presented to the court in the form of exhibits to the reply to the response to the motion for summary judgment or the affidavit. We believe the affidavit in total was improperly stricken and that we've shown enough. We've shown that Mr. Kerr had personal knowledge of those paragraphs to which I referred earlier. I believe it was 16 through 38. Thank you. You're welcome. Good morning, Your Honors. Good morning. Please, the court. There are a number of basics on which this court can affirm the lower court's decision. I want to, with the court's permission, talk about two of them. The Illinois Sales Representative Act was intended to compel a manufacturer or seller of a commissioned item to make payment quickly, within 13 days, of a clearly ascertainable, clearly identifiable item. We know that because the statute requires payment within 13 days, so it obviously must be something that is clearly ascertainable and identifiable. We also know that because the remedy for not doing that is fairly draconian, which is exemplary damages, attorney's fees. So Jane sells a widget. She knows how much her commission is. Sometime between the time that she sells it and the manufacturer gets paid, her contract is canceled. That's specifically the situation that is referenced in the legislative history that we've put into our briefs. And that makes sense also because it follows from a corollary to the Illinois Wage Claim Act, which requires an employer to pay a salaried employee within 14 days or by the next pay period, also very quickly. I'm sorry to interrupt, but in this case, what step did they miss? If the court wasn't able to determine what their damages were, what step along this process did they miss in terms of saying, these are our damages, 1 plus 1 equals, and the trial court says you can't figure out the damages. Well, I think the step they missed, and if I'm answering the question correctly, is that the act does not apply in the first place to this because this case is not about a specific identifiable commission. This is a case where a company says, I've got a contract with the manufacturer, and sometime over the last six years, I think I was underpaid because I should have gotten 12 percent, and I only got 4 percent, and sometimes I got 10 percent, but I don't really know how much I was underpaid. I don't really know when I was underpaid, and I can't really say what specific commission or item I was underpaid on, and we know that to be the case here because four months after we filed our declaratory judgment action, asking that this contract be set aside, or at least the termination provision be set aside, and we be allowed to terminate, four months after that, they filed their first complaint, and their first complaint, which was filed in February of 2013, we filed our declaratory in September of 2012, their first complaint says, and it's an accounting action, it says, we don't know how much we're owed. We don't know if we're owed anything, and specifically, we need discovery and litigation in order to determine how much we're owed. That's paragraph 9 and paragraph 14. So if they don't know, and they need to do an accounting case to figure out how much they're owed from a breach of contract over the last six years, how would we be able to know that? Almost more importantly, with respect to this case, is they're seeking to apply the act retroactively, and there's absolutely nothing in the statute or any case law that would allow you to do that, because we came in and said, we want to terminate, and they said, no, you can't terminate, and we went to the appellate court, and the appellate court agreed with us that this contract was a contract of perpetual duration. So it was 17 months after we filed our declaratory, the appellate court says, you can terminate, and after that, the termination date, and this is important, was fixed by the court. In every other case that you can look at that applies the Homeboy Sales Representative Act, the employer knows or the manufacturer knows, here's the termination date. My 13 days starts now. I need to pay within 13 days. In this case, the termination date was fixed years later, and it was fixed by the court, not by the parties. So then what they're saying is, and this is the absurd result that comes out of this case, is in 2015 or 2016, the court sets and fixes the date, and we want it applied retroactively, so your liability springs, because you can't obviously pay something within 13 days that happened three years ago. That is why Judge Larson and Judge Brennan repeatedly told counsel, told TLC, sorry to burst the line, this is a breach of contract case. This is not an Illinois Sales Representative Act case. Judge Larson on March 17, 2015 says, you need to replete that counterclaim as a breach of contract. The whole thing for the period before September 24, 2012 is going to be a breach of contract. And what we went through in this case is we had 20 different claims that eventually came down to the two before this court. And breach of contract was dropped. So unless there's any other questions with respect to the Illinois Sales Representative Act, I can quickly go to the procuring clause claim, which is the other one the court found in our favor on summary judgment. I think it's a relatively straightforward analysis. The contract requires, contract between the parties require either a purchase order or a sale to generate a commission. Count 6 says, I'm entitled to a commission with respect to these two programs that were, quote, sold to Walmart. Tony Kerr says, he's the president of TLC, a verbal commitment by Walmart is a sale. Therefore, I'm entitled to a commission. He's the only one that says that. The depositions of his employees and the deposition of a Walmart representative and the agreement between Ricoh and Walmart say the opposite. And that's what the judge was able to balance. And that's uncontradicted. Walmart does not obligate itself legally to verbal commitments made in a conference room at somebody's office. Those depositions at which this testimony was put forth were all their witnesses disclosed in their 213 interrogatory. They didn't go to any of the depositions. They didn't attend them. They didn't ask any questions of the people. Matter of fact, they tried to bar us from taking the depositions after they identified them. That was denied. And then they tried to bar us from cross-examining them at the time of trial. You can draw your own conclusions as to why they did not want to take their own clients' depositions. But there's absolutely no controverted evidence to suggest that any of these people were not testifying in accordance with what Walmart's policies were. So the bench trial judge, Judge Brennan, who has a trial schedule a month from when the summary judgment, will hear the exact same evidence. If there's nothing else, Your Honors, that's all I have. Rebuttal. Thank you. With regard to Counsel's argument about specific identifiable commissions, we have 5,425 pages of documents of a document that was certified to by Walmart, which shows each and every purchase order that was issued between December of 2007 and the end of 2012. The contract was terminated in September of 2012. So we have identifiable commissions with regard to products. We don't have to look and go after and find out what those products sold out for that five-year period. We have to differentiate between that five-year period and the information that we don't have all of with respect to the reorders after September 2012 of products that we had sold before. That's another issue on the motions to dismiss for procuring costs. We definitely have specific identifiable commissions. And although at the time they filed a declaratory judgment, we didn't know at that point what those sales were for the five years, we subsequently, very shortly thereafter, received the 5,425-page report from Walmart, and it has been certified. So we know what those commissions would be. We just don't know exactly what the commissions would be on the procuring costs, and we were never able to pursue discovery on that because of the dismissal of account with respect to the procuring costs. With regard to, I alluded, I spoke on this earlier, but the contract that we have between us, between RICO and TLC says we get a commission on a product that is sold or products for which RICO receives a purchase order. The way it was treated between us, between RICO and TLC, was that a sale was tantamount to a commitment. A commitment was a sale. So when they received commitments for 100,000 products, 100,000 items of a certain product, they started paying commissions on that. And there's evidence of that before your honors. There's evidence of that in the record, and I've referred to it in my original brief and in my reply brief. So if you will look at that, you'll see I even have a copy of an email here. Is that in the record? It's in the record. All right. They say these are prepaid commissions. Oh, we've already paid you $50,000 on the commitments that we received from Walmart, and we're going to pay you another $10,000 next week. And do you know the amount of returns that were under purchase order? If there were returns, they credited themselves on the returns. I mean, do you have any documentation as to what those returns were? We don't have any. We haven't received any defense on their part that there were any returns. So we don't have any information that there were any returns. And the last point, with regard to applying the act retroactively, we are not seeking to apply the act retroactively. The letter that they sent us on September 24, 2012, the same day they filed the territory judgment, says it was effectively terminated. It says we want to terminate as of today. We are terminating effective immediately. And then several times, and I refer to that in my reply brief, several times, RICO has taken the position that the agreement was terminated as of September 24, 2012. They took it with respect to pleadings that they filed. They took it at the deposition of Brian Ford when Mr. Blackman said the agreement was terminated September 24, 2012. Now they come up with later, which they have a habit of doing, of coming up with new defenses and new ideas. This agreement was terminated effectively and legally September 24, 2012, and we are seeking commissions that should have been paid and that weren't paid between December 2007 and September 24, 2012. And neither Judge Larson nor Judge Brennan said that this was not an Illinois sales representative act case. They said, I believe they said we should file a breach of contract claim, but I believe that the breach of contract claim is subsumed in the opportunistic advantage claim that we've made in count three where we say that despite the fact that you have been granted the right to terminate by the decision of this court because the contract was deemed to be one of indefinite duration, that this was not contemplated by the parties when they made the contract and it was taking advantage of TLC after TLC had, through its efforts, created a position for RICO as a preferred vendor had been involved in creating $27 million. Do you have any citation that would support that theory? Yes. I've cited a number of cases. I know the cases you've cited. A number of cases. And recently, Slay v. Allstate. Just the last few weeks, which Your Honor has allowed us to file a supplemental authority. It's beyond the reasonable expectation of the parties when they agree to a mutual consent, when Mr. Care focused all of his attention on RICO and getting RICO involved with Walmart in a way that they were never involved in before from here to here. And they're still working with Walmart. It created $27 million in sales, and they took an opportunistic advantage, which was not within the reasonable expectation of the parties, by terminating this agreement. After they had tried to bring Mr. Care and TLC, tried to convince him to accept a different contract at a lesser commission rate, they were very happy with what he did for them, but he refused because he thought he had a contract that was enforceable. And he thought that he had done everything possible to make that contract productive for both he and for RICO, which he did for RICO, and they're still reaping the benefits of it today. Thank you. Thank you, gentlemen. We will take this case under advisement. Call the next case.